[No. D043928. Fourth Dist., Div. One. Dec. 20, 2004.]

CRAIG L., Plaintiff and Appellant, v.
SANDY S. et al., Defendants and Respondents.

---

**COUNSEL**

Leslie Ellen Shear for Plaintiff and Appellant.

Judith Klein for Defendant and Respondent Sandy S.

Timothy Smith for Defendant and Respondent Brian A.

---

**OPINION**

**BENKE, Acting P. J.—** If, during a marriage, a child is fathered by a man who is not married to the mother of the child, the presumptions provided by Family Code[1] sections 7540 and 7611 subdivision (a), permit the mother and her husband to prevent the biological father from ever establishing any parental rights over the child. However, where, as here, the mother and her husband have allegedly permitted the biological father to receive the child into his home and hold him out as his child, the biological father may assert the rebuttable presumption provided by section 7611, subdivision (d).

Accordingly, in this case we reverse the trial court's order quashing the paternity petition of a man who alleges that he is the biological father of a child who he received into his home.

 In reaching this conclusion we recognize that when, as is alleged here, more than one presumption of paternity arises under section 7611, section 7612 requires that a trial court weigh the "considerations of policy and logic." However, contrary to the holding of the trial court, the state's interest in protecting the marriage and promoting family stability does not per se outweigh the interests of a presumptive father and child in maintaining their relationship. When, as here, a married couple has permitted another man to hold a child out as his own such that the presumption provided by section 7611, subdivision (d), would arise, the trial court must evaluate a number of factors and in the end protect the well-being of the child.

---

[1] All further statutory references are to the Family Code unless otherwise indicated.

## FACTUAL SUMMARY

In the spring of 2001 respondent Sandy S. was married to Brian A. Appellant Craig L. is an attorney and was a family friend of Sandy and Brian. Indeed, Craig represented Brian in a criminal matter. During the spring of 2001 Sandy and Craig had a brief sexual relationship.

Sandy became pregnant during the affair and delivered Jeffrey S. on February 11, 2002. While Sandy was carrying Jeffrey, all parties believed Brian was Jeffrey's father. Indeed, Brian took Sandy to the hospital when she went into labor and assisted in the delivery. However, routine testing at the hospital disclosed that Jeffrey's blood was "Rh negative." Because both Brian and Sandy are Rh positive, this discovery eliminated the possibility Brian was Jeffrey's biological father.

When Sandy advised Brian that he was not Jeffrey's father and that Craig was the only other possible father, Brian reacted angrily. Immediately following Jeffrey's birth, Sandy and Jeffrey stayed at her mother's home in San Clemente. Eventually, however, Sandy returned with Jeffrey to the home she shared with Brian.

According to Craig's petition, he and his wife, Kathryn L., agreed to participate as fully as possible in Jeffrey's upbringing. Craig signed a support agreement and made support payments to Sandy. When Sandy returned to work, Kathryn took care of Jeffrey three to four days a week in the home she and Craig shared. According to Craig's petition, when Jeffrey was a few months old the visits began including one overnight stay each week. Although disputed by Sandy and Brian, Craig further alleged that he held Jeffrey out to his family and friends as his son.

On March 31, 2003, Sandy sent Craig an e-mail in which she advised him that she no longer needed the childcare services Craig and Kathryn had been providing.

## TRIAL COURT PROCEEDINGS

On April 3, 2003, Craig filed a petition alleging he was Jeffrey's presumed father under the terms of section 7611, subdivision (d). Shortly thereafter, he filed a motion for a temporary order permitting him to maintain visitation with Jeffrey. The motion for temporary relief was never heard by the trial court. Craig also moved for an order directing that the parties submit to DNA testing. That order was not heard either.

Initially, Craig named only Sandy as a respondent. Sandy moved to join Brian and her motion was granted. Brian then moved to quash Craig's

petition. Brian argued that because he was Sandy's husband at the time of Jeffrey's conception and birth, he was Jeffrey's presumed father under section 7611, subdivision (a), and that his status prevented Craig from asserting paternity under section 7611, subdivision (d). On September 4, 2003, the trial court granted Brian's petition. In its statement of decision the trial court found: "(17) If Craig were able to prove that he is a presumed father pursuant to California Family Code Section 7611(d), Subdivision (a) of California Family Code Section 7630 would not confer upon him standing to challenge paternity of Brian who is a presumed father pursuant to California Family Code section 7611(a). [¶] (18) There is a strong public policy in California to maintain the integrity of the unitary family and the welfare of Jeffrey requires a concern for Jeffrey's perceived legitimacy. [¶] (19) The court finds that pursuant to Statute, Decisional Law, and California's strong public policy to maintain the integrity of a child's legitimacy, Craig does not have standing to establish a paternal relationship."

In light of its determination that Craig did not have standing to assert paternity, the trial court found that it was not necessary to address Craig's motions for temporary visitation and DNA testing.

Craig filed a petition for a writ of supersedeas and in the alternative a writ of mandate. We denied the petition for writ of supersedeas but expedited his appeal.

## DISCUSSION

### I

### *Craig's Claim*

A. *Section 7611, Subdivision (d)*

Section 7611, subdivision (d), gives presumed paternity to a man who "receives the child into his home and openly holds out the child as his natural child." In interpreting the statutory predecessor to section 7611, subdivision (d), the court in *In re Richard M.* (1975) 14 Cal.3d 783, 790–796 [122 Cal.Rptr. 531, 537 P.2d 363], found that a child who stayed with his biological father every other weekend had been received into the father's home. The level of contact Craig has alleged during the first year of Jeffrey's life is sufficient to establish paternity under section 7611, subdivision (d). (See *In re Richard M., supra*, 14 Cal.3d at p. 795; but see also *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 828–829 [4 Cal.Rptr.2d 615, 823 P.2d 1216].) Thus Craig had standing to initiate paternity proceedings under section

section 7630, subdivision (b). (*Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1220–1221 [92 Cal.Rptr.2d 294].)

## B. *Section 7540*

Contrary to Sandy and Brian's brief, the conclusive presumption of paternity provided by section 7540 does not bar Craig's paternity action. Section 7540 states: "Except as provided in Section 7541, the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage." Because Brian was cohabiting with Sandy at both the time of Jeffrey's conception and his birth, he falls within the scope of section 7540. (See *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 937, fn. 4 [72 Cal.Rptr.2d 871, 952 P.2d 1139] (*Dawn D.*).)

However, section 7541 provides in pertinent part: "(a) Notwithstanding Section 7540, if the court finds that the conclusions of all the experts, as disclosed by the evidence based on blood tests performed pursuant to Chapter 2 (commencing with Section 7550), are that the husband is not the father of the child, the question of paternity of the husband shall be resolved accordingly.

"(b) The notice of motion for blood tests under this section may be filed not later than two years from the child's date of birth by the husband, or for the purposes of establishing paternity by the presumed father or the child through or by the child's guardian ad litem. As used in this subdivision, 'presumed father' has the meaning given in Sections 7611 and 7612." (Italics added.)

Here, although Brian falls within the description of a father within the meaning of section 7540, Craig's claim is not barred by section 7540. Rather, because Craig brought his claims before Jeffrey's second birthday and alleges he is a presumed father under section 7611, subdivision (d), under the express terms of section 7541, subdivision (b), his claim is not subject to section 7540.

## C. *Dawn D.*

In *Dawn D.*, the mother and her husband prevented the biological father from actually receiving his offspring into his home within even the broadest interpretation of section 7611, subdivision (d). Notwithstanding the absence of any statutory standing, the biological father argued that he nonetheless had the constitutional right to establish such a relationship. In rejecting this contention the court found that in the absence of any social relationship between the child and the biological father, the state could adopt

a substantive rule of law which prevented such a relationship from ever developing. The court stated: "Here, Jerry [the biological father] has never had any personal relationship with Dawn's child, only an alleged biological link with an attempt to negotiate an agreement for child support and visitation. As explained above, in *Michael H. v. Gerald D.* . . . the United States Supreme Court decided that a biological father's mere desire to establish a personal relationship with the child is not a fundamental liberty interest protected by the due process clause. Accordingly, in this case Jerry's claim must fail." (*Dawn D., supra,* 17 Cal.4th at p. 942.)

Craig's claim is of course markedly different than the claim considered in *Dawn D.* Most importantly, unlike the biological father in *Dawn D.*, Craig alleges facts which would give rise to the presumption provided by section 7611, subdivision (d). He alleges not only a great deal of physical contact with Jeffrey but a meaningful relationship with Jeffrey. As we discuss more fully below that relationship not only supports a statutory right under section 7611, subdivision (d), but an interest which may well be subject to protection under the due process clause of the United States Constitution.

In sum, although under section 7540 and the holding in *Dawn D.,* a married couple has the right to prevent a biological father from ever establishing any paternal relationship with a child born into the marriage, where the couple permits such a relationship to develop they cannot unilaterally terminate it. Thus Craig's claim under section 7611, subdivision (d), is not barred by either the conclusive presumption of section 7540 or the holding in *Dawn D.*

## II

### *Brian's Claim*

Brian also had standing to pursue a paternity claim. As Sandy's husband at the time of Jeffrey's birth, he could pursue a claim not only under section 7540 but under the broader provisions of section 7611, subdivision (a). Contrary to Craig's suggestion, Brian's ability to make a claim under section 7540 did not preclude Brian from also making a claim under section 7611, subdivision (a).

Although distinct, the conclusive presumption set forth in section 7540 and the rebuttable presumptions recognized under section 7611, subdivision (a), are in no sense mutually exclusive. Because it requires proof of cohabitation, the section 7540 presumption is narrower than the section 7611, subdivision (a), presumption. The cohabiting requirement of section 7540 has been interpreted as requiring proof that the husband and wife were " ' "living

together as husband and wife" ' " (*Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1115 [39 Cal.Rptr.2d 535]) at the time of conception. (*Brian C. v. Ginger K., supra,* 77 Cal.App.4th at p. 1203.) As our cases have repeatedly recognized, the presumption embodied in section 7540 is a rule of substantive law which in general[2] is not subject to contest by a husband, a mother or a child after a child is two years old. (See *In re Marriage of Freeman, supra,* 45 Cal.App.4th at pp. 1444–1445.) In the landmark case of *Kusior v. Silver* (1960) 54 Cal.2d 603, 619 [7 Cal.Rptr. 129, 354 P.2d 657], the court found: "There are significant reasons why the integrity of the family when husband and wife are living together as such should not be impugned. A conclusive presumption is in actuality a substantive rule of law and cannot be said to be unconstitutional unless it transcends such a power of the Legislature."

■ In contrast, section 7611, subdivision (a), provides a *rebuttable* presumption where a man "and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a judgment of separation is entered by a court." The rebuttable presumption of section 7611, subdivision (a), does not require any proof of cohabitation; rather, the only predicate is birth during a valid marriage or within 300 days after the marriage is terminated. Importantly, under section 7630, subdivision (a)(2), the presumption created by section 7611, subdivision (a), may be challenged by the child, the mother or the husband, at any time so long as it is brought within a reasonable time "after obtaining knowledge of relevant facts." Thus, unlike a conclusively presumed father under section 7540, the rights and obligations of a presumed father under section 7611, subdivision (a), may be asserted or challenged even after a child reaches the age of two.

■ Section 7540 and section 7611, subdivision (a), are not in any manner incompatible. Proof of cohabitation and the passage of two years from birth will give a husband far greater protection of his paternal rights, and far less of an opportunity to be relieved of paternal obligations, than is afforded the husband who cannot show he was living with the mother at the time of conception or the husband whose child is less than two years old. However, there is nothing on the face of the statutes which prevents a husband, who cannot show cohabitation or who did cohabit but has a child less than two years old, from asserting alternative rights under section 7611, subdivision (a). By its express terms the face of section 7611, subdivision (a), includes both cohabiting and noncohabiting husbands.

---

[2] After a child is two years old an interested party may challenge a husband's paternity only on the grounds the husband was sterile or impotent. (§ 7540; see *In re Marriage of Freeman* (1996) 45 Cal.App.4th 1437, 1444–1445 [53 Cal.Rptr.2d 439].)

Notwithstanding the inclusive provisions of section 7611, subdivision (a), Craig argues that section 7541 somehow prevents a cohabiting husband within the meaning of section 7540 from asserting alternative rights under section 7611, subdivision (a). Craig relies on the fact that under section 7541, subdivision (a), the question of paternity is resolved according to the results of blood tests. However, Craig's narrow interpretation of section 7541 ignores both important statutory limitations on the right to obtain blood tests and the views of a majority of our Supreme Court as recently expressed in *In re Jesusa V.* (2004) 32 Cal.4th 588, 618 [10 Cal.Rptr.3d 205, 85 P.3d 2].

 Section 7541, subdivision (b), places an important procedural hurdle in the path of unwed biological fathers, such as Craig, who seek blood tests under section 7541, subdivision (a). Under the express terms of section 7541, subdivision (b), the husband, the presumed father and the child by a guardian ad litem are the only parties who may move for the blood tests provided by section 7541, subdivision (a). Significantly, section 7541, subdivision (b), further provides: "As used in this subdivision, 'presumed father' has the meaning given in Sections 7611 *and* 7612." (Italics added.) Thus under a plain reading of section 7541, subdivision (b), an unwed biological father may obtain blood tests but only if he meets the requirements of sections 7611 *and* 7612.

 Section 7612, subdivision (b), in turn provides a significant limitation on the universe of presumed fathers. It provides: "If two or more presumptions arise under Section 7611 which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." As we read the statutory scheme, an unwed biological father has no right to blood tests under section 7541, subdivision (a), unless he has satisfied the requirements of sections 7611 and 7612, including the weighing process required by section 7612, subdivision (b). In our view, if the Legislature did not intend that an unwed biological father's challenge under section 7541 be subject to the weighing requirements of section 7612, subdivision (b), the Legislature would not have made an express reference to section 7612 in section 7541, subdivision (b).

 Our view that under section 7541 biology is an important but not determinative factor is consistent with the views expressed by the Supreme Court in *In re Jesusa V. In re Jesusa V.* resolved a conflict between a husband claiming paternity under section 7611, subdivisions (a) and (d), and an unwed biological father asserting paternity under section 7611 subdivision (d). The court rejected the unwed biological father's contention that proof of his biological paternity defeated the presumption of paternity available to the nonbiological fathers under section 7611. (*In re Jesusa V., supra,* 32 Cal.4th at p. 604.) Two dissenting opinions had suggested, as does Craig, that under

section 7541 blood tests control paternity and that biology should also therefore control paternity under section 7611. However, the Supreme Court rejected the dissenters' premise that under section 7541 blood tests will always defeat a nonbiological father's competing claim to paternity: "The legislative history of section 7541 . . . fails to support either dissenting opinion. According to these materials, the 1990 amendment to section 7541 was intended to provide unwed biological fathers, who were previously foreclosed from challenging the husband's conclusive presumption of paternity, ' "the *opportunity* to establish paternity" ' when they have demonstrated an interest in raising and providing for their children. [Citation.] A mere *opportunity* for the unwed biological father to establish paternity hardly supports the claim that biology is *necessarily* determinative. Indeed, in construing a statute similar to section 7541, the Colorado Supreme Court observed that the provision 'does not state that blood evidence is conclusive of fatherhood in *all* circumstances, or that it automatically eliminates *other* presumptions of fatherhood.' [Citation.]" (*In re Jesusa V., supra,* 32 Cal.App.4th at p. 618.)[3]

▮ In sum, nothing in sections 7540 or 7541 prevent Brian from asserting a claim under section 7611, subdivision (a). Because Craig has a valid competing claim under section 7611, subdivision (d), the conflict between their claims must be resolved under the weighing process prescribed by section 7612, subdivision (b).

## III

### *No Preference Between Presumed Fathers*

Sandy and Brian suggest that in light of the conclusive presumption provided by section 7540 and the state's conceded interest in preserving the stability of marriages, the presumption provided to husbands under section 7611, subdivision (a), will always be weightier than the presumption afforded men who take children into their homes and acknowledge them. We find no basis for this conclusion.

▮ In interpreting a statute we must look first to its express provisions. (*Adoption of Kelsey, supra,* 1 Cal.4th at p. 826.) ▮ Here the express language of section 7612 gives preference to the presumption "which on the

---

[3] The Colorado Supreme Court case the court cited in *In re Jesusa V.* was *N.A.H. v. S.L.S* (Colo. 2000) 9 P.3d 354. In *N.A.H. v. S.L.S.,* the Colorado Supreme Court, interpreting analogous statutes, determined that neither biology nor marital status were controlling where competing paternity claims are asserted. (*Id.,* at p. 361.) The court concluded "it is evident from the statutory scheme as a whole that presumptions of fatherhood can be the starting point for an adjudication of paternity, not the end of the inquiry." (*Id.* at p. 362.)

facts" is weightier. This language is not consistent with a per se preference for one section 7611 presumption over any of the other section 7611 presumptions. Indeed, had the Legislature intended to give the marital presumption preference, it could have expressly done so quite easily.

Secondly, a per se rule, which would require termination of an existing paternal relationship in favor of preserving any marriage, without regard to the harm the child might suffer, is at direct odds with the entire statutory framework governing paternity actions. As the court in *Adoption of Kelsey* noted, the constitutionally valid objective of our paternity laws is "the protection of the child's well being." (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 845.) In addition in *Brian C. v. Ginger K.* the court noted that increasingly over the last three decades, our courts have resolved paternity disputes by looking to the existence and nature of the social relationship between the putative father and child. (*Brian C. v. Ginger K, supra,* 77 Cal.App.4th at pp. 1210–1216.) In *In re Marriage of Freeman, supra,* 45 Cal.App.4th at pages 1445–1446, we gave great weight to the social relationship between father and child and refused to permit a man who had assumed the role of father to avoid those obligations when his marriage to the child's mother dissolved. We stated: " ' "A man who has lived with a child, treating it as his son or daughter, has developed a relationship with the child that should not be lightly dissolved and upon which liability for continued responsibility to the child might be predicated. This social relationship is much more important, to the child at least, than a biological relationship of actual paternity. . . ." ' " A rule which would not require evaluation of the nature of a man's relationship with a child before terminating that relationship is not consistent with the well-being of a child or the importance our courts have placed on the existence of such a relationship.

We must also recognize that the impact of a relationship between an unwed father and his child on the state's interest in preserving marriage will vary from case to case. In some instances the nonmarital paternal relationship will be a substantial burden on a marriage while in other cases it will have little if any impact. (See *Brian C. v. Ginger K., supra,* 77 Cal.App.4th at p. 1217.) For instance, in *Brian C. v. Ginger K* the child, his mother and the putative father lived together for a year before the mother returned with the child to her husband. Given those marital circumstances, the court found that the state's interest in promoting marital stability was relatively weak. (*Ibid.*)

Moreover, we have found no case which holds that under our statutory scheme the state's interest in marriage will always outweigh the interests of a man and a child with whom the man has established a paternal relationship. Indeed, in *Dawn D.,* in rejecting the biological father's constitutional claim, the court took pains to distinguish between an unwed father's

interest in preserving an existing parent-child relationship and the claim that a biological connection alone was sufficient to support a liberty interest under the due process clause. (*Dawn D., supra,* 17 Cal.4th at p. 942.)

 Again, the conclusion we have reached is consistent with the reasoning and holding of the Supreme Court in *In re Jesusa V.* In *In re Jesusa V.* the biological father had qualified under section 7611, subdivision (d), because the child had lived with him and her mother until shortly before her second birthday. The mother's husband took the child into his home, where the husband lived with the mother's five other children, after the biological father had been incarcerated for raping and beating the mother. The mother's husband asserted paternity under section 7611, subdivisions (a) and (d). The biological father asserted that under section 7612, subdivision (b), biology was always the weightier of the considerations of policy and logic. In rejecting this contention the Supreme Court, relying on a number of out-of-state cases stated: "[O]ur construction-which permits a court to consider *every* relevant consideration of policy and logic-is in accord with every UPA state to have addressed the issue. [¶] The [trial] court thus was obliged to weigh all relevant factors-including biology-in determining which presumption was founded on weightier considerations of policy and logic." (*In re Jesusa V., supra,* 32 Cal.4th at p. 608, fn. omitted.) As we read *In re Jesusa V.,* under section 7612, subdivision (b), no single factor—whether social or biological—controls resolution of the conflict between competing presumed fathers.[4]

 In sum then, when as here, conflicting presumptions arise under sections 7611, subdivision (a), and section 7611, subdivision (d), under section 7612, a court must make factual findings with respect to each presumption and only then weigh which presumption is entitled, in that case, to greater weight. The nature of each presumed father's role in the life of a child and the marital circumstances will vary from case to case and thus the trial court must make its determination under section 7612 on a case-by-case basis. In resolving such a conflict, the trial court must at all times be guided by the principle that the goal of our paternity statutes is "the protection of the child's well-being." (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 845.)

---

[4] We note that a statute which did not fully consider the value of an existing paternal relationship might be subject to constitutional challenge. In *Michael H. v. Gerald D.* (1989) 491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333] five of the justices either found or assumed that a man who had established a parental relationship with a child born into an existing marriage had the right to a hearing at which he would be allowed to show that maintenance of his relationship with the child was in the child's best interest. (*Id.* at p. 136 (conc. opn. of Stevens, J.); *id.* at p. 136 (dis. opn. of Brennan, J.); *id.* at p. 157 (dis. opn. of White, J.); see *Brian C. v. Ginger K., supra,* 77 Cal.App.4th at p. 1213.)

## CONCLUSION

■ Here the trial court did not engage in any factfinding with regard to the nature of Craig's relationship with Jeffrey. Rather, the trial court found that even if Craig was a presumed father within the meaning of section 7611, subdivision (d), Brian's presumed status under section 7611, subdivision (a), would deprive Craig of standing under section 7630. Because the trial court made no factual findings about the nature of Craig's relationship with Jeffrey, it did not properly weigh that relationship against the interests embodied in Brian's status as a presumed father under section 7611, subdivision (a), and the nature of his relationship with Jeffrey. Accordingly, we must reverse the trial court's order quashing Craig's petition.

On remand the trial court must determine whether Craig is in fact a presumed father under section 7611, subdivision (d), and, if he is, the nature of Craig's relationship with Jeffrey, the nature of Brian's relationship with Jeffrey, and the impact recognizing Craig's paternity will have on Jeffrey. As we have indicated, in weighing the conflicting interests under section 7612, subdivision (b), the trial court must in the end make a determination which gives the greatest weight to Jeffrey's well-being. (See *In re Jesusa V., supra*, 32 Cal.4th at pp. 607–608.)

Order reversed.

Nares, J., and Haller, J., concurred.